# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| STATE OF WASHINGTON, | No. 49403-5-II |
| --- | --- |
| Respondent, | |
| v. | |
| ORLENA R. DRATH, | PART PUBLISHED OPINION |
| Appellant. | |

LEE, J. — Orlena R. Drath appeals her convictions for residential burglary, first degree burglary, first degree theft, theft of a firearm, first degree unlawful possession of a firearm, first degree trafficking in stolen property, and bail jumping, and the resulting sentence of 128 months of confinement. She argues that defense counsel provided ineffective assistance during the plea negotiation process by misinforming her of the potential sentencing range she faced if found guilty on all charges at trial. Drath also argues that defense counsel provided ineffective assistance by failing to object to a statement the prosecutor made during closing argument. Finally, Drath contends that the trial court violated her constitutional right to present a defense by limiting her cross-examination of an adversarial witness.

In the published portion of this opinion, we hold that defense counsel's failure to provide Drath with her correct sentencing range prejudiced Drath and, thus, amounted to ineffective assistance of counsel. In the unpublished portion of this opinion, we hold that defense counsel

was not ineffective for failing to object to a statement the prosecutor made during closing argument and that the trial court did not violate her constitutional right to present a defense by limiting her cross-examination of an adversarial witness.

Accordingly, we reverse and remand to the trial court for further proceedings consistent with this opinion.

FACTS

A.    JUDGEMENT AND SENTENCE

Between March and April 2011, Drath and her then boyfriend, Scott Herigstad, repeatedly broke into their neighbors' home and took approximately 75 firearms and an unspecified number of knives and swords. The couple then sold some of the stolen guns and knives.

The State charged Drath with residential burglary, first degree burglary, first degree theft, theft of a firearm, first degree unlawful possession of a firearm, second degree unlawful possession of a firearm, first degree trafficking in stolen property, and bail jumping for her involvement in the burglaries. A jury found Drath guilty as charged, and she was sentenced to serve a total of 128 months in confinement. Pursuant to RCW 9.94A.589(1)(c),[1] the sentencing court ordered Drath's

---

[1] Under RCW 9.94A.589(1)(c), "If an offender is convicted under RCW 9.41.040 for unlawful possession of a firearm in the first or second degree and for the felony crimes of theft of a firearm or possession of a stolen firearm, or both, the standard sentence range for each of these current offenses shall be determined by using all other current and prior convictions, except other current convictions for the felony crimes listed in this subsection (1)(c), as if they were prior convictions. The offender shall serve consecutive sentences for each conviction of the felony crimes listed in this subsection (1)(c), and for each firearm unlawfully possessed."

RCW 9.94A.589 has been amended since the events of this case transpired. However, the amendments do not materially affect the statutory language relied on by this court. Accordingly, we refrain from including the word "former" before RCW 9.94A.589.

sentences for first degree unlawful possession of a firearm and theft of a firearm to run consecutively.

B. MOTION FOR A NEW TRIAL

Drath filed a pro se motion for a new trial. In her motion, Drath alleged that she was "drastically misinformed about possible sentencing ranges if [she] went to trial." Clerk's Papers (CP) at 103 (capitalization omitted). Drath had a worksheet given to her by counsel in which her counsel wrote that if found guilty on all eight charges, Drath would face a sentencing range between 87 and 116 months. The information written on the worksheet failed to show that under RCW 9.94A.589(1)(c), a sentence for theft of a firearm and first degree unlawful possession of a firearm would run consecutively. Had the worksheet applied RCW 9.94A.589(1)(c), Drath's sentencing range would have been between 103 and 136 months.

Drath was appointed new counsel, who requested an evidentiary hearing concerning Drath's ineffective assistance of counsel claim. At the hearing, the State called the five attorneys who had represented Drath over the course of her case to testify.

1. R. Sergi

As the first attorney assigned to Drath's case, Sergi represented Drath between April 2011 and October 2013. Sergi testified that in the course of his practice, he would ordinarily talk to clients about consecutive sentencing ranges. However, Sergi acknowledged that Drath's case was not "necessarily normal" because he had anticipated it would be transferred to the federal government. 10 Report of Proceedings (RP) (July 15, 2016) at 1440. And given the time that had passed, Sergi could not remember whether he had ever discussed Drath's sentencing range with her. He also could not recall whether he had ever discussed a plea offer with Drath.

2.      S. Taschner

Taschner represented Drath between October 7, 2013, and June 2, 2014.  Taschner discussed the possibility of a plea deal with Drath at a May 2014 meeting.  According to Taschner, Drath became upset at the suggestion of a plea.  Because Drath was upset at the meeting, Taschner never "specifically mentioned what the bottom and top of the ranges would be on the sentence." 10 RP (July 15, 2016) at 1454.  He planned to talk about the specific ranges at his next scheduled meeting with Drath, but Drath did not show up to that appointment.

During his representation of Drath, Taschner informed her that the sentences for theft of a firearm and either first or second degree unlawful possession of a firearm would run consecutively.  However, Taschner brought up consecutive sentencing in the context of discussing additional charges the State could file against Drath.  Taschner testified that:

> In other words, I guess what I'm saying is that yes, we did discuss that some of these counts would run consecutive to one another, but that discussion also, I think, occurred in the context of trying to give her an appreciation that even more counts could be added that would also run consecutive with one another.

10 RP (July 15, 2016) at 1456.

Taschner never discussed specific sentencing ranges with Drath.  Instead, he advised her that if the State were to file additional charges in her case, Drath could face more than 15 years in confinement.  As to whether Drath was ever willing to consider a plea offer, Taschner testified, "I don't recall [Drath] coming out and saying that there was – that no matter what she was going to trial.  That wasn't stated."  10 RP (July 15, 2016) at 1458.

3.      P. Jones

Jones represented Drath between June 2, 2014, and January 27, 2015.  When asked what discussions Jones had with Drath regarding consecutive sentencing in her case, Jones testified:

3

> I can't recall every discussion specifically, although this was a year and a half ago. With that said -- two years ago, really. That said, there were a number of occasions on which we had that discussion, on which we compared the offers, as I received it from [the State], to the potential of time she could otherwise do. I mentioned the story earlier about the gentleman in Stevens County who got a hundred and twenty-five years, and I had specifically related that story to her as an example of what a consecutive sentence could do as opposed to a normal one.

10 RP (July 15, 2016) at 1468.

Nonetheless, Jones could not recall telling Drath that if convicted, she faced a sentencing range between 103 and 136 months. Jones never presented Drath with this specific number because he did not believe it truly represented the high end of sentencing Drath faced since the State could have filed additional firearm charges. Therefore, while Jones discussed the reality of consecutive sentencing for the firearm charges, this was in the context of Jones informing Drath that the State could file even more firearm charges.

Jones and the State negotiated a plea offer sometime before November 2014, which would have resulted in an agreed 41.5 month sentence. Drath, however, did not accept the offer.

4.      J. Gazori

Gazori represented Drath between February 4, 2015, and September 1, 2015. Gazori represented Drath during her first trial in August 2015, which ended in a mistrial.

On June 2, 2015, Gazori met with the State to discuss the charges, Drath's offender score, and a plea offer. The State provided Gazori with a handwritten chart outlining the sentencing range Drath faced if convicted as charged. This chart showed that two of the counts were mandatorily consecutive and accurately identified the sentencing range as charged between 103 and 136 months. This chart also showed a column labeled as a June 2 offer in which the State wrote out a range for four of the charges and then circled the range of 67 to 75 months. The State's

4

June 2 offer was for Drath to plead guilty to theft of a firearm, first degree unlawful possession of a firearm, first degree trafficking in stolen property, and bail jumping.

Gazori conveyed this offer to Drath. However, instead of using the word consecutive, he informed her that certain sentences would "run after this." 10 RP (July 15, 2016) at 1491. The record does not show that Gazori ever showed or provided Drath a copy of the State's handwritten chart, which outlined her sentencing range if convicted at trial compared to the State's June 2 offer.

According to Gazori, he and the State subsequently discussed the plea offer before court one morning, without Drath present. During that discussion, the State did not write down the names of the charges, but it wrote down their count numbers. The State then drew a line to another set of counts to indicate which counts would run concurrent with one another. Gazori reviewed this handwritten document with Drath. However, Gazori never made a copy of the document, could not recall passing it on when he transferred the file, and had no idea what happened to that document. Drath rejected the plea offers Gazori presented to her.

On the day Drath's case ended in mistrial, the State offered to settle the case on the same plea terms that Herigstad had accepted, which resulted in 33 months of confinement. Gazori conveyed this offer to Drath, who asked for time to think it over and to discuss the offer with her family. Gazori asked the State if it would keep the offer open for one day, which the State declined to do. The State withdrew the offer before Drath responded.

When asked whether Gazori ever specifically informed Drath of the potential sentencing range she faced if convicted, he responded:

> I can't say with certainty that I did that. I – my recollection is I paraphrased it in that the one-oh-three to a hundred and thirty-six, if we just round that off roughly to the midrange is a hundred and twenty, so that's ten years, followed by -- so what I did is I put it, I put it in more vague terms of years than specific numbers of months.

5

10 RP (July 15, 2016) at 1505.

> 5.    F. Jardine

Jardine represented Drath from September 8, 2015, until April 5, 2016. Jardine negotiated plea offers with the State in January 2016, which culminated in the State reopening its previous June 2 offer with a sentencing range between 67 and 75 months. Drath did not accept this offer.

As the trial date approached, Jardine and the State continued to discuss a possible plea resolution. Jardine proposed 40 months. The State counteroffered with 50 months.

When the State counteroffered with 50 months, Jardine asked, "If we are looking at reaching an agreement for 50 [months] what crimes are you proposing – I will be meeting [with] Ms. Drath this week to review." Ex. at 17 (attachment 7). The State responded, "Delete the Trafficking from the offer of 6.2.15." Ex. at 17 (attachment 7). Jardine agreed that the "offer would have gotten to the fifty months by using two consecutive counts and an additional count." 10 RP (July 15, 2016) at 1522. Jardine did not identify which counts she referred to. She testified, "and we had the math different because of the points being calculated different." 10 RP (July 15, 2016) at 1522-23. She did not explain what she meant by this statement. Drath rejected this 50-month offer.

On cross-examination, Jardine identified a document in her handwriting with her office stamp dated January 11, 2016. Jardine testified that she typically writes this information on a yellow page, hands the yellow page to the client, and then keeps a copy in her file. This handwritten document listed the various charges Drath faced, along with the sentencing ranges in terms of months. The document stated the total sentencing range as charged was between 87 and 116 months, with "12.4 [months] good time." Ex. at 18 (July 15, 2016).

6. Orlena Drath

Drath testified that she only discussed possible sentencing consequences with some of her attorneys. Specifically, she discussed "[a] little with Gazori," and Jones had relayed a narrative to her concerning one of his other clients. 10 RP (July 15, 2016) at 1542. Drath could not recall Gazori ever telling her the range of months she faced if she were found guilty on all charges at trial.

At Drath's first meeting with Jardine, they discussed a handwritten document outlining her potential sentence if convicted on all charges at trial. Drath identified the original handwritten document Jardine had provided, which stated a total sentencing range between 87 and 116 months. On a separate line in the document, Jardine wrote "6 years." Ex. at 18. According to Drath, Jardine wrote this number to show the length of sentence she faced if convicted as charged. Jardine presented this number as Drath's worst case scenario.

Drath also testified that she had discussed the 50-month offer with Jardine after Jardine had informed her of the erroneous sentence range. Specifically, Drath testified:

Q. Okay. Were there discussions, later discussions about a resolution involving fifty months?
A. When [Jardine] started the negotiations, she did bring up forty to [the prosecutor] and he came back with the fifty months, and then [Jardine] advised me that it really wasn't a deal, that I might as well take it to trial because [the prosecutor] wasn't trying to make any good offers.
Q. But that offer of fifty months was communicated to you, correct?
A. Yes, it was.
Q. And you, after consultation with Ms. Jardine, did not take it, correct?
A. No.
Q. Okay.
A. She advised it probably, it wasn't worth it to take it.

10 RP (July 15, 2016) at 1547.

When asked whether she would have considered the 50-month plea offer if she knew her true sentencing range, Drath testified, "Yeah, I would have considered it." 10 RP (July 15, 2016) at 1548. When asked whether she would have accepted the offer, Drath responded, "I'm not sure if I can answer that." 10 RP (July 15, 2016) at 1548.

According to Drath, when she commenced trial with Jardine as counsel, Drath believed her sentence range if convicted was 87 to 116 months. In her conversations with her other four prior attorneys, Drath had never been told that her true sentencing range was 103 to 136 months.

7.      Trial Court's Ruling on Motion for New Trial

The trial court found that Jardine had failed to take into account the effect of RCW 9.94A.589(1)(c) when informing Drath of her sentencing range if convicted on all charges. The trial court also found that because Drath faced a maximum sentence of 136 months, Jardine's "counsel to the defendant on January 11, 2016 was incorrect and contained a significant error." CP at 7. The trial court ruled that Jardine's representation fell below an objective standard of reasonableness when she failed to properly advise Drath of the impact of RCW 9.94A.589(1)(c) on the charges filed against her.

However, the trial court also ruled that Drath had failed to show a reasonable probability that, but for counsel's deficient representation, the result would have been different. The trial court based its ruling on Drath's inability to testify that she would have accepted the State's final plea offer if she had known her correct sentencing range.

The trial court denied Drath's motion for a new trial. Drath appeals.

ANALYSIS

Drath contends that she was provided ineffective assistance of counsel in the plea negotiation process when defense counsel misinformed her of the maximum sentencing range she

faced if convicted. The State "does not dispute Drath's allegation that her trial attorney erred," but argues that Drath fails to show resulting prejudice. Br. of Resp't at 2. We hold that defense counsel's failure to provide Drath the correct sentencing range prejudiced Drath, and thus, amounted to ineffective assistance of counsel.

A.    LEGAL PRINCIPLES

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the accused the right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). An ineffective assistance of counsel claim is a mixed question of law and fact that we review de novo. *State v. Jones*, 183 Wn.2d 327, 338, 352 P.3d 776 (2015).

An ineffective assistance of counsel claim entails a two-pronged inquiry in which the defendant must show (1) counsel's performance was deficient and (2) " 'the deficient performance prejudiced the defense.' " *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (quoting *State v. Thomas*, 109 Wn.2d 222, 225-226, 743 P.2d 816 (1987)), *cert. denied*, 135 S. Ct. 153 (2014). An ineffective assistance claim fails if the defendant fails to satisfy either prong. *Strickland v. Washington*, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

B.    DEPRIVATION OF THE ABILITY TO MAKE AN INFORMED DECISION IS PREJUDICIAL

Because the State does not dispute that Drath's counsel erred in miscalculating Drath's sentencing range, the issue before us is whether Drath has shown that her counsel's deficient performance was prejudicial. *See Estes*, 188 Wn.2d at 463; *Lafler v. Cooper*, 566 U.S. 156, 163, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012). We hold that counsel's deficient performance prejudiced Drath.

The right to effective assistance of counsel extends to the plea bargaining process. *Estes*, 188 Wn.2d at 463; *Lafler*, 566 U.S. at 166. Effective assistance of counsel includes " 'assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial.' " *Estes*, 188 Wn.2d at 464 (quoting *State v. A.N.J.*, 168 Wn.2d 91, 111, 225 P.3d 956 (2010)). At a minimum, counsel must " 'reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case proceeds to trial so that the defendant can make a meaningful decision as to whether or not to plead guilty.' " *Id.* (quoting *A.N.J.*, 168 Wn.2d at 111-12)).

To establish prejudice, the defendant must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Although this standard is lower than a preponderance standard, the defendant must affirmatively "show more than a 'conceivable effect on the outcome.' " *Estes*, 188 Wn.2d at 458 (internal quotation marks omitted) (quoting *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006)). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

In the context of plea negotiations, the "defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. "In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court." *Id.* at 164.

In *Estes*, our Supreme Court held that Estes met his burden of showing a reasonable probability that had he known he faced a life sentence, the result of the proceeding would have differed. 188 Wn.2d at 466. Even though the record showed that Estes had declined to negotiate from the outset of his case, the court held that had Estes been fully informed, there was a reasonable probability that "he would have negotiated a different outcome." *Id.* The court held, "Estes was

10

denied the ability to 'mak[e] an informed decision' about whether to plead guilty, and we find that defense counsel's conduct prejudiced Estes." *Id.* (alteration in original) (quoting *A.N.J.*, 168 Wn.2d at 111)).

Here, defense counsel did not simply fail to convey crucial information to her client. Counsel misinformed Drath as to the sentencing range she faced if convicted at trial. As a result, Drath proceeded to trial with an understanding that if convicted of all charges, the maximum sentence she faced was 116 months when, in reality, she potentially faced 136 months. As in *Estes*, because her counsel misinformed her of the risk she faced, Drath was denied the ability to make an informed decision as to whether to accept the State's final 50-month plea offer. *Id.*

The State distinguishes this case from *Estes* by arguing that Drath had rejected several pleas, whereas in *Estes*, the defendant refused to negotiate altogether. We find this distinction unpersuasive.

The State's argument assumes that a defendant's rejection of prior plea offers evidences unwillingness to engage in the plea bargaining process. But a defendant's perspective toward resolving his or her case through plea bargaining might very well change over the course of his or her case.

Here, the record shows that Drath rejected four plea offers in the five years her case was pending. But the record also shows that Drath considered the plea offers and actively discussed the offers with her various attorneys. Moreover, Drath testified that if she had known her true sentencing range when presented with the State's final 50-month plea offer, she "would have considered it." 10 RP (July 15, 2016) at 1548. Thus, it is reasonably probable that had Drath known she faced a maximum sentence that was 20 months longer than her attorney advised, the result of the proceeding would have differed.

11

The State argues that Drath fails to show prejudice because "it is doubtful that Drath did not know that she faced the potential of consecutive sentences" when three of Drath's attorneys had informed her of the consecutive sentencing provision of RCW 9.94A.589(1)(c). Br. of Resp't at 9-10. The State also argues that Drath faced "a much less substantial risk than the risk faced by Estes, which was the risk of a life sentence without parole." Br. of Resp't at 10.

As to the gravity of the risk Drath faced, " 'any amount of [additional] jail time has Sixth Amendment significance.' " *Lafler*, 566 U.S. at 165 (alteration in original) (quoting *Glover v. United States*, 531 U.S. 198, 203, 121 S. Ct. 696, 148 L. Ed. 2d 604 (2001)). As to being informed of consecutive sentencing, even though three of Drath's attorneys testified that they had discussed the concept of consecutive sentencing, none of these attorneys provided Drath with a sentencing range taking RCW 9.94A.589(1)(c) into account.

Taschner testified that he only discussed consecutive sentencing with Drath in the context of additional charges that the State could file. Instead of informing Drath of the sentencing range she faced on her current charges, Taschner advised Drath that if the State filed additional charges, she could face more than 15 years confinement. Jones never informed Drath of her actual sentencing range, but instead relayed a story of a different client in order to illustrate the gravity of consecutive sentencing. Gazori did tell Drath that some of her charges would "run after this," but did not specifically show Drath how this would elevate her sentencing range from 87 to 116 months to 103 to 136 months. 10 RP (July 15, 2016) at 1491.

Therefore, contrary to the State's argument, it is doubtful that Drath knew to add 16 to 20 months to her standard sentencing range based on the conversations she had with prior counsel on the concept of consecutive sentencing. The record shows that the only attorney who provided Drath with a concrete sentencing range based on Drath's specific charges was Jardine. But Jardine

advised Drath, based on an erroneously calculated sentencing range, that the State's 50-month plea offer "really wasn't a deal" and that "it wasn't worth it to take it." 10 RP (July 15, 2016) at 1547. Because the sentencing range Jardine provided was erroneous, Drath was not afforded the ability to make an informed decision whether to accept the State's final 50-month plea offer.

Finally, the State argues that Drath cannot show reasonable probability she would have accepted the State's final plea offer because when asked, she responded, " 'I'm not sure if I can answer that.' " Br. of Resp't at 10 (quoting 10 RP (July 15, 2016) at 1548). The State is correct that the record does not show with complete certainty that Drath would have accepted the State's final plea offer had she known her correct sentencing range. "But we need not be 100 percent sure that the outcome would have been different to find prejudice." *Estes*, 188 Wn.2d at 466. Here, there is a reasonable probability that had Drath known she faced a maximum sentence 20 months greater than she was told, she would have negotiated a different outcome. Accordingly, we hold that Drath was prejudiced by her counsel's deficient performance.

C.      REMEDY

"The remedy for a lawyer's ineffective assistance is to put the defendant in the position in which he or she would have been had counsel been effective." *State v. Hamilton*, 179 Wn. App. 870, 879, 320 P.3d 142 (2014). In *Lafler*, the United States Supreme Court outlined a remedy dependent upon the specific terms of the plea offered. 566 U.S. at 171.

If the plea offer entailed the defendant pleading guilty to certain counts or counts less serious than the ones for which the defendant was convicted after trial, "a resentencing based on the conviction at trial may not suffice." *Id.* In this situation, the appropriate remedy "may be to require the prosecution to reoffer the plea proposal." *See id.* The trial court may then exercise its

discretion in deciding whether to vacate the trial conviction and accept the plea or leave the conviction undisturbed. *See id.*

Here, because the plea offer entailed Drath pleading guilty to certain counts other than the ones for which she was convicted at trial, the appropriate remedy is to remand and require the prosecution to reoffer the final 50-month plea offer. *See id.* If Drath accepts, then the trial court may exercise its discretion in deciding whether to accept the plea, vacate Drath's trial conviction, and sentence Drath in accordance with the law. *See id.* If Drath rejects the plea offer or the trial court rejects the plea, then Drath's trial conviction and sentence stands. *See id.* If Drath fails to accept the State's offer within 90 days, then her trial conviction and sentence stands.

Accordingly, we reverse and remand for further proceedings.

A majority of the panel having determined that only the foregoing portion of this opinion will be published in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

UNPUBLISHED TEXT FOLLOWS

FACTS

A.      THE BURGLARIES

Fernando Gino Maffei and Susan Karlmann shared a home that they would check on every couple of weeks. Maffei used the home to store a number of personal items, including his gun and knife collections.

On April 2, 2011, Maffei and Karlmann stopped by the home to pick up some household items and discovered that that the entire house had been ransacked. Maffei also discovered that his two gun safes had been cut open and emptied. Maffei estimated that approximately 75 guns

were missing from his residence. And his knife and sword collection was missing from a display case in the master bedroom. Karlmann contacted law enforcement.

Detective Jeffery Rhoades of the Mason County Sheriff's Office was assigned to the case. During his investigation, Detective Rhoades followed a trail leading from the back of Maffei's house through the woods behind the property. The trail ended at the edge of the property where Orlena Drath and her boyfriend, Scott Herigstad, resided. Along the trail, Detective Rhoades found several items that Maffei had reported stolen, including a rifle leaned up against a tree.

Detective Rhoades later received a phone call from a local gun shop owner, who relayed that a customer had recently looked at a collection of firearms being offered for sale. This led Detective Rhoades to James Oakes, who had unknowingly purchased several of Maffei's stolen firearms. Oakes told Detective Rhoades that he had purchased the firearms at the home of George Cavanaugh. Detective Rhoades met with Cavanaugh, who told him that Drath and Herigstad had brought the guns to his house for sale.

Detective Rhoades obtained a search warrant for the home that Drath and Herigstad shared. In executing the search warrant, Detective Rhoades found a lot of the property Maffei had reported stolen inside a makeshift carport, including knives and an ammo can with Maffei's nickname on them. The house rested on pier blocks above the ground. In the space between the residence and the ground, Detective Rhoades found a firearms case containing Maffei's stolen swords, a metal pistol case, a handgun case, and cans of ammunition. Detective Rhoades also obtained a warrant to search Drath's truck and discovered one of Maffei's stolen handguns.

Detective Rhoades met with Drath, and she admitted to handling one of the firearms during the sale at Cavanaugh's residence. Drath contacted Detective Rhoades a couple weeks later and surrendered a plastic tub full of items taken from Maffei's home, including an ammunition

15

container and set of grips for a revolver pistol. Drath later contacted Detective Rhoades again and led him to two forts near the train tracks containing miscellaneous items Maffei had reported stolen.

B.    RELEVANT PORTIONS OF TRIAL

At Drath's trial, Detective Rhoades testified to the facts set out above. A number of witnesses testified to Drath's involvement in both the burglary of Maffei's house, as well as the sale of stolen firearms at Cavanaugh's house. Drath testified and denied her involvement altogether.

1.    Herigstad's Testimony

Herigstad pleaded guilty to three charges stemming from his involvement in the burglary of Maffei's house and the subsequent sale of firearms and knives from that burglary. He testified against Drath at her trial. Herigstad described Drath's extensive involvement in the burglaries, including her help in torching the safes, transporting the guns and knives, and subsequently selling the firearms at Cavanaugh's house.

On direct examination, the State questioned Herigstad about an undated letter he had sent to Drath while he was in jail on charges related to these events. In this letter, Herigstad wrote, "I just can't believe you would throw this all away when you know we were both to blame. At least I'm taking responsibility for what I did." 4 Report of Proceedings (RP) (Feb. 25, 2016) at 580. Herigstad testified that through this statement, he was referring to the burglary. Herigstad also wrote, "So, who ratted out who? I guess you really never did love me. It was all just a big lie. Just remember what I still know." 4 RP (Feb. 25, 2016) at 581. The letter itself was not admitted into evidence.

On cross-examination, Herigstad testified that he wrote the letter to Drath before he pleaded guilty. Herigstad admitted that he wrote several letters to Drath following this particular letter and that he was angry with Drath at the time.

Drath sought to cross-examine Herigstad regarding four other letters he had sent to her while he was in jail. Specifically, Drath sought to introduce the portions of letters in which Herigstad proposed marriage to Drath; Herigstad claimed he would not hold the statements Drath made to law enforcement against her; Herigstad offered to plead guilty if the State agreed to drop the charges against Drath; and Herigstad wrote in an undated letter that "I can't believe you think I told them it was all you when I haven't, to this day, given a statement." 4 RP (Feb. 25, 2016) at 625.

Drath argued that the portions of the letters she sought to introduce were relevant to her theory of the case that Herigstad only implicated Drath in the burglary after she rejected his marriage proposal. Drath also argued that Herigstad's tone in the undated letter evidenced this shift.

The trial court allowed Drath to cross-examine Herigstad on the contents of the first three letters, finding them relevant to her theory of the case. However, the trial court did not allow Drath to cross-examine Herigstad on the proposed portions of the undated letter, finding that the statements were irrelevant.

2.      Cavanaugh's Testimony

Cavanaugh also pleaded guilty to several charges stemming from his involvement in the case. And Cavanaugh also testified at Drath's trial.

Cavanaugh became involved with the burglaries after Drath and Herigstad brought some knives over to his house for sale and he bought one of Maffei's stolen knives from Drath. He later

helped Herigstad and Drath open one of Maffei's safes and transport goods from Maffei's house, including one to two firearms. According to Cavanaugh, Drath was involved in the sale of guns at his house and she sold one of the pistols to Oakes.

### 3. Other Witnesses

Cavanaugh's wife, Rita,[2] testified that Drath and Herigstad asked Cavanaugh for help opening one of the safes. She also testified that Drath and Herigstad later brought guns into her house.

Morgan Tucker, a friend of Cavanaugh's daughter, testified that he visited Cavanaugh's home in March 2011, and witnessed Drath and Herigstad selling knives and swords. Tucker saw Drath sell one of Maffei's knives to Cavanaugh.

Finally, Oakes testified about the day he purchased Maffei's stolen firearms at Cavanaugh's house. Drath arrived at the house with a box of pistols, and both Drath and Herigstad negotiated the price of the pistols with Oakes.

### 4. Closing Arguments

At the beginning of its closing argument, the State argued:

> The next thing that bears mentioning is that in, as in most cases, this is not a knock down drag out battle of each and every element of each and every crime. You'll have noticed … the various to-convict instructions where the elements were broken out . . . . That's what we call the elements, and they're numbered in those particular instructions.

> But they're not all in controversy, and basically what's in controversy is what role did the defendant play in all the crimes charged? Because there's absolutely no issue that there was a burglary at Mr. Maffei's residence over the month of March and early April of 2011. Absolutely, no. We know that timeframe because April 2nd is when they discovered the burglary.

---

[2] Because multiple individuals in this case share the last name Cavanaugh, we refer to George Cavanaugh by his last name and Rita Cavanaugh by her first name." No disrespect is intended.

9 RP (Mar. 3, 2016) at 1301-02.

The State continued to argue that several facts were not in controversy, including the fact that certain items were taken from Maffei's home and that stolen property was trafficked. The State argued, "the key question that you're going to be analyzing is, did the defendant do each of these?" 9 RP (Mar. 3, 2016) at 1303.

In Drath's closing argument, she called the jury's attention to several instructions. In particular, Drath directed the jury's attention to the instruction stating that Drath has pleaded not guilty "and that calls into question every element of every allegation." 9 RP (Mar. 3, 2016) at 1335. Drath argued, "The filing of the charge is not evidence, and your decision is based solely on the evidence presented here during this past couple of weeks." 9 RP (Mar. 3, 2016) at 1335.

Prior to closing arguments, the trial court instructed the jury that:

> The defendant has entered a plea of not guilty. That plea puts in issue every element of each crime charged. The State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt.

Clerk's Papers (CP) at 133.

## ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL FOR FAILING TO OBJECT

Drath argues that her trial counsel's failure to object to and request a curative instruction for remarks the prosecutor made during closing constituted ineffective assistance of counsel. We disagree.

#### 1. Legal Principles

As discussed above, a defendant claiming ineffective assistance of counsel must show (1) counsel's performance was deficient and (2) resulting prejudice. *Estes*, 188 Wn.2d at 457-58. Both prongs must be satisfied to prevail on an ineffective assistance of counsel claim. *Id.*

Counsel renders deficient performance if it "falls 'below an objective standard of reasonableness based on consideration of all the circumstances.' " *Id.* at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). "There is a strong presumption that counsel's performance was reasonable." *Kyllo*, 166 Wn.2d at 862. Counsel's performance is not deficient if the conduct can be characterized as legitimate trial strategy or tactics. *Id.* at 863.

2.      Counsel's Performance was not Deficient

Drath contends her trial counsel was deficient because she failed to object when the prosecutor referenced the elements in the jury's to-convict instructions and argued that they were " 'not all in controversy.' " Br. of Appellant at 38 (quoting 9 RP (Mar. 3, 2016) at 1302). Drath argues that in making this statement, the State trivialized its burden of proof. We disagree.

Arguments made by the prosecutor misstating or trivializing the State's burden to prove the defendant's guilt beyond a reasonable doubt constitutes prosecutorial misconduct. *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). For example, in *Lindsay*, our Supreme Court held the prosecutor trivialized the State's burden by analogizing the State's burden of proof to a halfway complete jigsaw puzzle.180 Wn.2d at 436. Similarly, in *State v. Warren*, our Supreme Court held that a prosecutor improperly misstated the State's burden of proof by repeatedly telling the jury that reasonable doubt does not mean, " 'you give the defendant the benefit of the doubt.' " 165 Wn.2d 17, 25, 195 P.3d 940 (2008), *cert. denied*, 556 U.S. 1192 (2009).

Drath compares the prosecutor's remarks here to those in *Lindsay* and *Warren*. However, when viewed in the context of his entire argument, the prosecutor's comments did not trivialize the State's burden of proof. Instead, the prosecutor argued that not all elements were in controversy because it was undisputed that Maffei's residence had been burglarized. He also argued that it was uncontroverted that a number of items were taken from Maffei's home. The

State argued, "the key question that you're going to be analyzing is, did the defendant do each of these?" 9 RP (Mar. 3, 2016) at 1303. Even Drath conceded these facts were uncontroverted when she argued, "there's no question in this case that Ms. Karlmann and Mr. Maffei were violated. There's no question that their home was invaded, that they had a burglary and they lost a lot. There's no question as to what their losses are." 9 RP (Mar. 3, 2016) at 1320.

In light of the record, her counsel's failure to object to this statement could be characterized as legitimate tactical strategy. In closing, Drath's counsel addressed the prosecutor's statement by directing the jury's attention to the instruction stating that a plea of guilty "calls into question every element of every allegation." 9 RP (Mar. 3, 2016) at 1335. In doing so, her counsel decided to fully address the prosecutor's statement during her closing argument, rather than object. We hold that such tactical decision did not fall below an objective standard of reasonableness. Therefore, Drath's ineffective assistance of counsel claim based on a failure to object fails.

## C. CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE

Drath contends that the trial court violated her constitutional right to present a defense by limiting her cross-examination of a letter Herigstad wrote to her while in jail. We disagree.

### 1. Standard of Review

The confrontation clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. CONST. amends. VI. Article I, section 22 of the Washington Constitution also guarantees the right of a defendant to "meet the witnesses against him face to face." We review alleged violations of the confrontation clause de novo. *State v. Tyler*, 138 Wn. App. 120, 126, 155 P.3d 1002 (2007).

Criminal defendants also have a constitutional right to present a defense. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. 1, § 3, 22; *Chambers v. Mississippi*, 410 U.S. 284, 294,

93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). However, this right and the right to confrontation are not absolute. *State v. Arredondo*, 188 Wn.2d 244, 265, 394 P.3d 348 (2017). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798, *rehearing denied*, 485 U.S. 983 (1988). The defendant's right to present a defense is subject to " 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " *State v. Cayetano-Jaimes*, 190 Wn. App. 286, 296, 359 P.3d 919 (2015) (quoting *Chambers*, 410 U.S. at 302).

We review the right of confrontation involving a limitation on the scope of cross-examination for abuse of discretion. *State v. Lee*, 188 Wn.2d 473, 486, 396 P.3d 316 (2017); *State v. Blair*, 3 Wn. App.2d 343, 350, 415 P.3d 1232 (2018). The scope of cross-examination remains within the discretion of the trial court. *State v. Russell*, 125 Wn.2d 24, 92, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995). And we give deference to a trial court's ruling limiting cross-examination. *Lee*, 188 Wn.2d at 486. We will not disturb the trial court's limitation of the scope of cross-examination "unless it is the result of manifest abuse of discretion." *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). A court abuses its discretion if its ruling is "manifestly unreasonable or based upon untenable grounds or reasons." *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). "Allegations that a ruling violated the defendant's right to a fair trial does not change the standard of review." *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

We first look at whether the trial court abused its discretion in excluding the evidence. If the trial court did not abuse its discretion, then this court's inquiry ends. If the trial court abused its discretion, then we review the constitutional challenge de novo. *See, e.g., State v. Clark*, 187 Wn.2d 641, 389 P.3d 462 (2017); *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

2.     The Trial Court did not Abuse its Discretion

At trial, only evidence that is relevant is admissible.  ER 402.  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

A defendant has the right to confront witnesses against her with bias evidence so long as it is at least minimally relevant.  *State v. Fisher*, 165 Wn.2d 727, 752, 202 P.3d 937 (2009).  But the trial court still retains authority to set boundaries as to the extent the defendant "may delve into the witness' alleged bias 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' "  *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S Ct. 1431, 89 L. Ed. 2d 674 (1986)).

Drath argues that the content of Herigstad's letters were relevant to establish his bias against Drath.  But this is not the same argument Drath made to the trial court.  Instead, Drath argued that the contents of the letters were relevant to her theory of the case because they showed that Herigstad only implicated Drath in the burglary after she rejected his marriage proposal. According to Drath, the fourth excluded letter evidenced a shift in Herigstad's previous supportive tone.

However, Herigstad's tone in the excluded letter was consistent with his tone in the previous letters.  Even though Herigstad begins the letter with the statements Drath sought to introduce, Herigstad also tells Drath that he will always love her "no matter what" in the letter. Ex. at 178.  Thus, the letter did not actually demonstrate a shift in which Herigstad became angry and no longer supported Drath.  Also, unlike other letters, the excluded letter was not dated.

23

Without knowing when the letter was actually sent to Drath, it is unclear how she could have shown a "turning point" in the series of letters Herigstad sent. 4 RP (Feb. 25, 2016) at 613.

It was well within the trial court's authority to set boundaries as to the extent Drath could delve into such evidence based on a concern that the evidence was only marginally relevant or confused the issues. *See Fisher*, 165 Wn.2d at 752. When read in the context of the entire record, the undated letter did not evidence Herigstad's shift in support. Therefore, the trial court's ruling excluding these statements was not based on untenable reasons or grounds. We hold that it was not manifest abuse of discretion for the trial court to limit the scope of cross-examination on this basis.

Further, even if the trial court did abuse its discretion in excluding this evidence, Drath fails to show she was deprived the right to conduct meaningful cross-examination of Herigstad. At trial, Drath cross-examined Herigstad on the contents of a different letter he had sent her in which he wrote, " 'So, who ratted out who? I guess you really never did love me. It was all just a big lie. Just remember what I still know.' " 4 RP (Feb. 25, 2016) at 581. She also cross-examined Herigstad about the marriage proposal she had rejected and Herigstad's subsequent anger toward her. Therefore, Drath fails to show exclusion of this one portion of an undated letter on infringed her right to confront and cross-examine an adverse witness.[3]

---

[3] Even if Drath showed constitutional error, we hold the error harmless beyond a reasonable doubt. An error of constitutional magnitude is harmless "if it is proved to be harmless beyond a reasonable doubt." *Jones*, 168 Wn.2d at 724. This requires proof beyond a reasonable doubt " 'that any reasonable jury would have reached the same result without the error.' " *Id.* (quoting *State v. Smith*, 148 Wn.2d 122, 139, 59 P.3d 74 (2002)).

Here, the evidence against Drath was overwhelming. Detective Rhoades testified that he found some of Maffei's stolen items scattered along a trail leading to the house Drath shared with Herigstad. This included Maffei's rifle leaned up against a tree. The search of Drath and Herigstad's home also unearthed numerous items belonging to Maffei, including shotgun cases,

CONCLUSION

We hold that Drath was provided ineffective assistance of counsel. Based on the facts of this case, the appropriate remedy is to remand and require the prosecution to reoffer the final 50-month plea offer. If Drath accepts, then the trial court may exercise its discretion in deciding whether to accept the plea, vacate Drath's trial conviction, and sentence Drath in accordance with the law. If Drath rejects the plea offer or the trial court rejects the plea, then Drath's trial conviction and sentence stands. If Drath fails to accept the State's offer within 90 days, then her trial conviction and sentence stands.

_____
Lee, J.

I concur:

_____
Maxa, C.J.

---

knives, and ammo cans with Maffei's nickname on them. Detective Rhoades later discovered a handgun Maffei had reported stolen in a truck Drath had been driving. Further, Drath surrendered a number of Maffei's stolen items to Detective Rhoades and even led Detective Rhoades to two forts containing miscellaneous items Maffei had reported stolen.

Also, aside from Herigstad, four other witnesses testified that they saw Drath either handling or selling the knives and guns. Cavanaugh testified extensively to Drath's involvement in the burglary and sale of the stolen firearms. Further, Oakes testified that he witnessed Drath bring a box of pistols to Cavanaugh's house and that Drath negotiated the prices of the pistols with him. Even Drath admitted to Detective Rhoades that she had handled one of the firearms during the sale at Cavanaugh's home.

Thus, considering the record as a whole, Drath's inability to cross-examine Herigstad on a portion of one undated letter he wrote to her while in jail was harmless beyond a reasonable doubt.

Melnick, J. (Dissent in part) — I respectfully dissent from the majority's conclusion that Orlena Drath has shown prejudice to support her ineffective assistance of counsel claim.[4] After an evidentiary hearing, Drath's testimony belies a conclusion she demonstrated prejudice. She has failed to show that with a reasonable probability she would have accepted the State's plea offer if her lawyer's performance was not deficient. Any conclusion that she has shown prejudice is speculative.

In April 2011, the State filed a three count information against Drath. Approximately two months later, the federal government took over the prosecution and the State's charges were dismissed without prejudice. In May 2013, the State filed a four count information after the federal government returned the case to the State. In February 2014, the State added additional charges. When Drath failed to appear in court in 2015, the State added a bail jump charge. Every time a new charge was added, it changed the presumptive standard range.

From 2011 until 2016 when Drath finally went to trial, five different lawyers had represented her. During that time, the State made numerous plea offers. Drath rejected all of them including ones for 33 months, 41.5 months, and 50 months. This latter offer, the one at issue in this case, came about after Drath made a plea offer of 40 months. The State rejected Drath's offer and counter offered with 50 months. Drath rejected the counter offer and went to trial. She did so after having been advised by her lawyers that the top of her standard range was 116 months. In fact, it was 136 months. A jury subsequently convicted Drath of all eight felonies with which the State charged her. The court sentenced her to a standard range sentence of 128 months of confinement.

---

[4] I generally agree with the resolutions of the other issues not involving this ineffective assistance of counsel claim.

Drath then filed a motion for a new trial. She alleged she had been "drastically misinformed about possible sentencing ranges if [she] went to trial." Clerk's Papers (CP) at 103.

Based on the motion, the court appointed Drath a new lawyer. It then held an evidentiary hearing where all five of Drath's lawyers testified. Drath also testified.

When questioned about whether she would have considered the 50 month offer if she had been informed of the correct standard range, Drath stated, "Yeah, I would have considered it." 10 Report of Proceedings (RP) (July 15, 2016) at 1548. When asked whether she would have accepted the offer, Drath testified, "I'm not sure I can answer that." 10 RP (July 15, 2016) at 1548.

The court entered findings of fact and conclusions of law.[5] It concluded that Drath's trial lawyer, in the plea bargaining stage, was deficient for failing to properly advise her client of the fact some of her charges would run consecutive to each other. The court, however, denied the motion for a new trial. It reasoned that Drath had not demonstrated prejudice.

> The second prong of the *Strickland* test asks whether a defendant can show that there is a reasonable probability that, but for counsel's deficient representation, the result would have been different. The defendant has failed to meet this prong's test and cannot show that, but for counsel's deficient representation, her result would have been different. The defendant, when asked if she would have accepted the state's final offer had she know (sic) the correct maximum sentencing range she was facing if convicted, was unable to state that she would have accepted the offer, testifying instead that she was not sure she could answer that question.

CP at 10.

Drath appeals claiming ineffective assistance of counsel. She asks us "to vacate the convictions and allow Drath to make an informed decision whether to accept the 50-month plea offer or proceed to trial." Br of Appellant at 28

---

[5] Drath has not assigned error to the findings of fact. They are verities on appeal. *State v. Betancourth*, 190 Wn.2d 357, 363, 413 P.3d 566, 569 (2018)

We review claims of ineffective assistance of counsel de novo. *State v. Linville*, 191 Wn.2d 513, 518, 423 P.3d 842 (2018). To prevail on a claim of ineffective assistance of counsel, the defendant must show both that defense counsel's representation was deficient, and that the deficient representation prejudiced the defendant.[6] *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011).

Representation is deficient if after considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland v. Washington, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)*). To establish prejudice, in the context of pleas, a defendant must show that the outcome of the plea process would have been different with competent advice. *Lafler v. Cooper*, 566 U.S. 156, 163, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012).

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*Missouri v. Frye*, 566 U.S. 134, 147, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012) (Frye would have accepted plea offer with nondeficient representation.).

In *State v. Edwards*, 171 Wn. App. 379, 383, 294 P.3d 708, 717 (2012), the defendant alleged ineffective assistance of counsel because his lawyer failed to adequately advise him of plea

---

[6] In this dissent, I have chosen to only address the prejudice prong of the ineffective assistance of counsel claim.

options and sentencing consequences. In affirming the conviction, the court reasoned Edwards had not shown prejudice. *Edwards*, 171 Wn. App. at 403. "Edwards does not claim that he would have pleaded guilty either in exchange for the [special sex offender sentencing alternative] or the State's recommended standard range sentence of 51 to 68 months to life. He merely asserted after the jury's verdict that he 'would have pursued a plea negotiation.'" *Edwards*, 171 Wn. App. at 396.

*Edwards* is factually similar to the situation in the present case. While Edwards said he "would have pursued a plea negotiation," 171 Wn. App. at 396, Drath said she could not answer the question of whether she would have accepted the State's offer. Drath has not shown prejudice. Drath has not shown by a reasonable probability she would have accepted the State's offer of 50 months. In fact, in a hearing on her motion for a new trial on this issue, she could not affirmatively state she would have accepted the offer.

The majority relies extensively on *State v. Estes*, 188 Wn.2d 450, 395 P.3d 1045 (2017). However, that case is factually dissimilar from the situation before us. In *Estes*, the defendant's lawyer did not know that a deadly weapon enhancement converted one of the crimes Estes faced into a strike offense under the Persistent Offender Accountability Act. 188 Wn.2d at 456-57. As such, the lawyer failed to advise Estes that he was facing a life sentence. Estes refused to negotiate the case but did not have this important information. Nor did he know that the State would have been willing to negotiate to something other than a strike. *Estes*, 188 Wn.2d at 465-66.

In reversing Estes's conviction, the court concluded, "it is reasonably probable that had Estes known that there was a much higher chance that he would be spending life in prison, the result of the proceeding would have differed." *Estes*, 188 Wn.2d at 466. The court based this reasoning on the fact that Estes, lacking knowledge about an essential matter in his case, refused

to negotiate from the outset. However, it also realized that, it would be speculative to know what the State would have been willing to offer. *Estes*, 188 Wn.2d at 465-66. With this combination of facts, the court concluded Estes suffered prejudice. *Estes*, 188 Wn.2d at 466.

In the present case, we need not speculate. We know the State offered Drath a 50 month sentence. We also know that at the evidentiary hearing on Drath's motion for a new trial, which occurred more than four months after the jury found her guilty, and after she learned of the correct standard range, she could not tell the court she would have accepted the State's offer. On the motion for a new trial, Drath did not testify that, with reasonable probability, she would have accepted the offer. This factual dissimilarity with *Estes* is important. I believe the majority is speculating as to prejudice.

In the hearing on Drath's motion for a new trial on the issue before us, and after she knew the correct standard range, she could not say she would have accepted the State's offer. The purpose of the hearing was to determine that fact. Drath has not shown prejudice from her counsel's deficient performance. I respectfully dissent.

_____
Melnick, J.