# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Personal Restraint of: | No.  57695-3-II |
| WENDELL MAURICE CLARK, | |
| Petitioner. | UNPUBLISHED OPINION |

LEE, J. — Wendell M. Clark timely filed a personal restraint petition (PRP) alleging he is being unlawfully restrained for his convictions of second degree rape and fourth degree assault. Specifically, Clark claims (1) he received ineffective assistance of counsel when his trial counsel failed to properly inform him of his potential sentencing ranges if convicted of his charges, and he relied on an incorrect sentencing range when he chose to reject a plea offer from the State and instead proceed to trial; (2) he received ineffective assistance of appellate counsel on direct appeal when his appellate counsel failed to raise an ineffective assistance claim for the trial counsel's alleged failure to properly inform Clark of the sentencing ranges; (3) the State committed prosecutorial misconduct when it introduced certain evidence during trial and made statements during closing arguments about that evidence; (4) the trial court erroneously imposed crime-related community custody conditions that were unrelated to his crimes; and (5) he received ineffective assistance of counsel when his trial counsel failed to present evidence that contradicted the State's theory of the case and when his trial counsel failed to cross-examine the victim regarding memory issues.

Clark cannot establish prejudice in his claim of ineffective assistance of counsel based on an allegation that his trial counsel failed to properly inform him of the correct sentencing ranges; therefore, Clark's ineffective assistance of counsel claims based on information regarding the correct sentencing ranges fail.  Because the State did not engage in improper conduct by introducing certain evidence or commenting on that evidence, Clark's claim of prosecutorial misconduct fails.  The community custody conditions restricting Clark from entering establishments where alcohol is the primary item for sale and requiring urine and breath screening are not reasonably related to his crimes and should be stricken from his judgment and sentence.  However, the trial court did not err in restricting Clark from consuming and possessing alcohol and marijuana.  Finally, trial counsel's alleged failure to present evidence that contradicted the State's theory of the case did not constitute deficient performance, and Clark previously raised the issue of his trial counsel's failure to cross-examine the victim in his direct appeal and cannot re-raise the issue in a PRP.  Therefore, Clark's ineffective assistance of counsel claims on these bases fail.  Thus, we grant Clark's PRP in part, deny Clark's PRP in part, and remand to the trial court to strike the community custody conditions restricting Clark from entering establishments where alcohol is the primary item for sale and requiring urine and breath screening from Clark's judgment and sentence.

FACTS

A.    BACKGROUND

In early 2018, Clark and S.V. began dating.  By April 2018, Clark and S.V. had engaged in sexual intercourse.

2

On the evening of April 21, Clark came over to S.V.'s apartment. S.V. shared the apartment with her teenage daughter, K.V. K.V. was at home the evening of April 21.

In the early morning hours of April 22, Clark and S.V. engaged in consensual vaginal intercourse in S.V.'s bedroom. At some point during this encounter, Clark instructed S.V. to roll onto her stomach and, without asking or telling S.V., began engaging in anal sex with S.V. S.V. told Clark to stop and that she was in pain. S.V. attempted to push Clark off her, but Clark pinned S.V. down and continued to engage in anal sex with S.V. despite her protestations.

Later, after Clark fell asleep, S.V. went to the bathroom and began texting her friend, Katie Davis. Davis encouraged S.V. to contact the police. Davis also texted K.V. and asked K.V. to check on S.V. K.V. estimated that Davis contacted her around 1:00 a.m. K.V. then knocked on S.V.'s door and asked if S.V. was okay. S.V. told K.V. that she was fine and instructed K.V. to go back to bed. K.V. noticed that S.V. "was acting kind of off" but thought nothing of it until the following morning, when S.V. continued to "act[] a bit off." 4 Verbatim Rep. of Proc. (VRP) (May 16, 2019) at 690.

That afternoon, Clark discovered that his car had been towed from S.V.'s apartment complex. Clark was very angry his car had been towed; he believed that S.V. was responsible for not knowing her apartment complex's parking policy and he insisted that S.V. pay part of his tow bill. S.V. informed him that she did not have the money to do so. At some point during the argument, S.V. texted Davis about Clark's car getting towed. Clark and S.V.'s argument escalated, and S.V. asked Clark to leave because Clark began scaring her. Clark refused.

3

After Clark refused to leave, S.V. told K.V. to go to the apartment of K.V.'s friend, who also lived in the same complex. S.V. then texted her neighbor, the mother of K.V.'s friend, to call 911.

The police arrived. S.V. told the police she wanted Clark to leave and then disclosed that Clark had raped her the previous evening. The police arrested Clark and transported S.V. to the hospital for a sexual assault examination.

While at the hospital, S.V. met Detective Erik Anderson. Detective Anderson took photos of some bruising and injuries that S.V. had sustained. S.V. told Detective Anderson that her memory was "foggy or fuzzy." 3 VRP (May 15, 2019) at 517. Specifically, S.V. told Detective Anderson that she had epilepsy and, as a result, her memory could diminish over time. Detective Anderson provided S.V. with a blank form to write a statement.

On May 2, S.V. again met with Detective Anderson "to have some images photographed from her personal phone." 3 VRP (May 15, 2019) at 494. Specifically, the images were screenshots of the text conversations S.V. had had with Davis on April 22. S.V. had not initially informed the police of her text exchanges with Davis and had deleted the texts out of fear that Clark would read them. However, S.V. asked Davis to save the messages; Davis took screenshots of the conversations and sent the images back to S.V.

Nearly a year later, on April 2, 2019, Detective Anderson reached out to Davis regarding the text conversations between Davis and S.V. The screenshots that Detective Anderson had originally obtained from S.V. were missing portions of texts that had been inadvertently cut off during a file transfer. Thus, Detective Anderson's purpose in contacting Davis was to obtain a full copy of and submit the text conversations into S.V.'s case file. Because a year had elapsed since

4

the text conversations occurred, Davis initially retrieved the messages from Facebook Messenger[1] and transferred them back to her phone in the form of screenshots. As a result, the timestamps did not accurately represent when Davis's text conversations with S.V. occurred. Instead, the timestamps indicated when Davis took the screenshots. Specifically, the screenshots appeared to have been taken between 4:44 p.m. and 4:49 p.m.; no date is apparent. Nevertheless, one of the screenshots showed a conversation timestamp of 1:13 a.m.

In Detective Anderson's report of his meeting with Davis, he noted that Davis recalled receiving a surprise message from S.V. "on or around 4/22/2018." Initial Pet., Ex. H at 80. Davis estimated it was perhaps around 10:00 p.m. when she received a series of texts from S.V. regarding the incident with Clark.

B.      PLEA OFFERS

The State charged Clark with second degree rape (count 1), fourth degree assault (count 2), and tampering with a witness (count 3).[2] All counts included domestic violence (DV) designations. Trial was set for May 13, 2019.

In May 2018, the State made a plea offer of 51 months' confinement if Clark pleaded guilty to indecent liberties with forcible compulsion. At the time, Clark faced only a second degree rape

---

[1] Facebook Messenger is an instant messaging application that users may use to send messages, photos, videos, and to make calls.
MESSENGER, https://www.messenger.com/messengerfacts?locale=en_US (last visited June 12, 2024).

[2] The State initially filed an information in April 2018, charging Clark with second degree rape. The State later filed an amended information and second amended information in October 2018 and March 2019, respectively. The charges upon which the parties proceeded to trial were the result of a third amended information filed May 9, 2019.

charge with a sentencing range of 78-102 months. The plea offer assumed an offender score of 0. According to Clark's trial counsel, Clark rejected the plea offer because it required him to plead guilty to a sex offense.

The State did not make any other plea offers until May 2019. On May 1, 2019, the State communicated with Clark's counsel via email and indicated that it was willing to resolve the case if Clark pleaded guilty in one of three ways: "Rape 3 and tampering with a witness"; "Indecent liberties without force"; or "Assault 3 with sexual motivation." Br. of Resp't, App. C at 53. The State proposed the sentencing range on each option to be "12+-20 months, depending on what [option Clark was] interested in." Br. of Resp't, App. C at 53. On May 6, Clark's trial counsel discussed the options in the State's email with Clark in person, and Clark rejected each possibility. According to Clark's trial counsel, Clark rejected the plea offers because all three options were felony crimes that would have required Clark to register as a sex offender. Clark allegedly told his trial counsel that he would only consider a plea "to a misdemeanor non-sex offense." Br. of Resp't, App. D at 68.

Then, on May 10, the State made a final plea offer. The plea offer listed each of Clark's three charges and his exposure for each charge. The plea offer stated that Clark's potential minimum standard range, if convicted of all charges, was 86-114 months.[3] The State offered for Clark to plead guilty to third degree rape with a minimum standard range term of 6-12 months. According to Clark's trial counsel, he and Clark discussed the plea offer in full via telephone and

---

[3] The State admits that the range indicated on the final plea offer was incorrect. According to the State, if Clark had been convicted of all charges, he would have had an offender score of 3 and the plea offer should have listed a standard range of 102-136 months.

Clark declined the plea offer because "[Clark] was absolutely not going to plead guilty to a sex crime." Br. of Resp't, App. D at 66.

C.    TRIAL

Trial commenced on May 13. Several witnesses, including S.V., K.V., Clark, and members of law enforcement testified to the facts described above.

1.    Text Messages

During trial, the parties and trial court discussed the admissibility of the text conversations between S.V. and Davis. The State intended to lay the foundation for the text messages through Detective Anderson and then admit the messages through S.V. As Davis was not a witness in the proceedings, the trial court and parties agreed to redact Davis' text responses to S.V. The trial court admitted the redacted version of the text messages. Of the text messages, Detective Anderson testified that he was unable to conclude when the text conversations occurred because he only obtained screenshots.

Clark's trial counsel cross examined S.V. on the content and timing of the text messages. S.V. testified that the text message she sent to Davis regarding Clark's car getting towed would have been sent in the afternoon of April 22, 2018.

2.    Closing Arguments

The State, during its closing argument, discussed the evidence presented at trial. Specifically, the State argued:

> [S.V.'s] testimony is evidence. But I'm not asking you to decide this case based on her testimony alone because there's other evidence that was presented to you during this trial.

7

[S.V.]'s account is corroborated by . . . other evidence that you heard. It's corroborated by the interactions that she had with the police and with the sexual assault nurse examiner.

It's corroborated by the text messages that she sent her friend, Katie Davis shortly after it happened. . . .

. . . .

And yesterday when she testified she was nervous—she was crying—she had to look away several times. That is evidence that this happened—evidence that her testimony is truthful.

We also know that [the rape] happened because of the text messages that she sent to Katie Davis that night. I'd like to go through them with you.

5 VRP (May 16, 2019) at 852-53. After reviewing the text messages with the jury, the State

proceeded:

These are the text messages that [S.V.] sent that night—in the middle of the night—shortly after it happened while [Clark] was asleep. It explains what he had done to her. It showed that she was struggling but trying to understand the fact that he had just raped her.

These aren't words of a vindictive or lying person. These are words of somebody who is trying to rationalize what had just happened to them. Words of somebody who is trying to understand that the person who they had put their trust in was the wrong person to trust because it was somebody who had raped them.

It's easier to believe that you might have done something wrong to bring this upon yourself than to believe that someone who you put so much trust in would rape you.

These texts were so alarming to Katie Davis that she texted [S.V.]'s fifteen year old daughter to check and make sure that she was okay. And [K.V.] confirmed that. [K.V.] said she got a text from [Davis] in the middle of the night.

She went to check on her mother. [S.V.] said it was okay which is reasonable because she doesn't want [K.V.] to know she had just been raped. What mother wants their kid to know about that?

> But [K.V.] said that she knew she was off the next morning—looking back on it she knew she was off. These texts were sent hours before the issue about [Clark]'s vehicle arose.

5 VRP (May 16, 2019) at 854-55.

### 3. Conviction and Sentencing

The jury found Clark guilty of second degree rape and fourth degree assault, both with DV designations. The jury acquitted Clark of the tampering with a witness charge.

On June 28, 2019, the trial court held a sentencing hearing. During the hearing, the State noted that Clark had an offender score of 1 and that his standard sentencing range was 86-114 months. The State cited to *State v. Rodriguez*[4] and explained that Clark's offender score was based on the fact that Clark's concurrent conviction of fourth degree assault-DV fell within the definition of a repetitive DV offense, which added a point to Clark's offender score. The State recommended the high end of the standard sentencing range, or 114 months.

Clark's trial counsel had originally questioned whether Clark's assault conviction would qualify as a prior conviction for the purposes of the offender score and had planned to argue the assault was not "prior in the classic sense of the word." 5 VRP (June 28, 2019) at 902. However, the State provided Clark's trial counsel with *Rodriguez*, and Clark's trial counsel agreed that the case was on point and Clark's assault conviction added a point to his offender score. Clark's trial counsel requested the low end of the sentencing range.

---

[4] 183 Wn. App. 947, 958, 335 P.3d 448 (2014) (holding that a concurrent DV offense counts as a prior conviction and repetitive DV offense for the purposes of calculating an offender score), *review denied*, 182 Wn.2d 1022 (2015).

The trial court sentenced Clark to the high of his standard sentencing range, or 114 months' confinement, with any time released to be served on community custody. The trial court also imposed several community custody conditions. Those conditions included:

- No possession or consumption of alcohol
- No possession or consumption of marijuana
- May not enter establishments where alcohol is the primary sale item
- Submit to urine and/or breath screening at the direction of the Community Corrections Officer

Clerk's Papers (CP) at 64.

Clark claims that his trial counsel had informed him pre-trial, during trial, and immediately following trial that his potential sentencing range, if convicted of the charges, was 78-96 months. Then, a couple days before Clark's sentencing hearing, trial counsel visited Clark in jail and informed Clark that his sentencing range was actually "84-114" months. Initial Pet. at 15. However, trial counsel allegedly said he believed the State was wrong and that "he would challenge the 84-114 month sentence at [the] sentencing hearing." Initial Pet. at 15.

According to trial counsel, he provided Clark with all the information about every plea offer the State made and communicated the potential sentencing ranges listed on each offer. Additionally, trial counsel claimed that he provided Clark with information about the indeterminant sentence review board element of Clark's potential sentence if convicted of second degree rape. Finally, trial counsel acknowledged that he intended to argue at sentencing that Clark's assault conviction should not count as a prior conviction for the purposes of Clark's offender score. However, prior to sentencing, the State made trial counsel aware of *Rodriguez*, and trial counsel agreed that Clark's proper sentencing range was 86-114 months.

4. Bar Complaint

In August 2020, Clark filed a bar complaint against his trial counsel with the Washington State Bar Association (WSBA). In his complaint, Clark made several allegations of unethical conduct on the part of his trial counsel.

According to Clark, after his trial counsel presented the State's May 10, 2019 plea offer to him via telephone, Clark said he "would be willing to plead guilty and accept the year in county jail, if the state dropped the third degree rape or any type of sex offense charges." Suppl. Reply Br. of Pet'r, App. A at 37. Further, Clark admits he told trial counsel that "the removal of any and all sex offense charges was the most important thing to [him]." Suppl. Reply Br. of Pet'r, App. A at 37. Clark asserted that his trial counsel failed to take a counter plea offer to the State after discussing the State's plea offer.

According to Clark's trial counsel, Clark never asked him to take a counter offer to the State. The WSBA declined to resolve the differing accounts between Clark and his trial counsel regarding a counter offer. In its findings, the WSBA stated:

> You claim [trial counsel] did not present a counteroffer you wanted to make to the prosecutors just before trial began. Your proposal was to enter a plea to a non-sex offense. [Trial counsel] states that you did not ask to make a counteroffer just before trial began, and that while you had previously indicated that the only plea you would consider was a misdemeanor non-sex offense, that was something the State had never indicated would be acceptable. . . . We cannot resolve the dispute between these differing accounts of what occurred and, in light of our high burden of proof, we would be unable to prevail in showing that [trial counsel] . . . refused to present a viable counteroffer to the State.

Br. of Resp't, App. C at 37. The WSBA determined that Clark did not show by a clear preponderance of evidence that his trial counsel violated any ethical rules.

11

5.      Direct Appeal

Clark appealed his convictions to this court. *See generally State v. Clark*, 17 Wn. App. 2d 794, 487 P.3d 549 (2021) (published in part), *review denied*, 198 Wn.2d 1033 (2022). Clark argued ineffective assistance of counsel for trial counsel's failure to move to change venue based on the demographics of Clark County. *Id.* at 798. Clark also raised several claims in a Statement of Additional Grounds (SAG); specifically, Clark claimed "he was denied effective assistance for [trial] counsel's failure to ask specific questions of the victim." *Clark*, No. 53771-1-II, slip op. (unpublished portion) at 11, https://www.courts.wa.gov/opinions/pdf/D2%2053771-1-II%20Published%20Opinion.pdf.

Of Clark's claim regarding ineffective assistance of counsel for trial counsel's failure to ask specific questions of S.V., Clark argued that trial counsel "failed to question and impeach the credibility of SV on her medical condition and related memory problems." *Id.* at 30. We affirmed Clark's convictions, and the mandate terminating review was issued in January 2022. *Clark*, 17 Wn. App. 2d at 796.

Clark timely filed this PRP.

## ANALYSIS

A.      PERSONAL RESTRAINT PETITIONS

A petitioner may request relief through a PRP if they are under unlawful restraint. RAP 16.4(a)-(c). When reviewing a PRP, we may grant, deny, or remand for reference hearing. *In re Pers. Restraint of Schreiber*, 189 Wn. App. 110, 113, 357 P.3d 668 (2015).

Because collateral relief is an extraordinary remedy that seeks to disturb a final judgment, the petitioner must meet a high standard to obtain relief. *In re Pers. Restraint of Kennedy*, 200

Wn.2d 1, 12, 513 P.3d 769 (2022). A petitioner must establish by a preponderance of evidence either a constitutional error that has resulted in actual and substantial prejudice, or a nonconstitutional error that constitutes a fundamental defect resulting in a complete miscarriage of justice. *In re Pers. Restraint of Dove*, 196 Wn. App. 148, 154, 381 P.3d 1280 (2016), *review denied*, 188 Wn.2d 1008 (2017). Further, "[f]actual evidence, rather than conclusory allegations, must be offered in support of a PRP." *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 352, 496 P.3d 289 (2021); RAP 16.7(a)(2)(i). PRPs may not renew issues raised and rejected on direct appeal, "unless the interests of justice require the issue's relitigation." *Schreiber*, 189 Wn. App. at 113.

B.      INEFFECTIVE ASSISTANCE OF COUNSEL

Clark argues that his constitutional rights were violated when he received ineffective assistance of counsel from trial counsel for failure to advise Clark of his sentencing consequences. Clark also alleges that he received ineffective assistance of counsel from his appellate counsel for failure to raise an ineffective assistance claim regarding this same issue. Specifically, Clark alleges trial counsel repeatedly told Clark that the potential sentencing range, if convicted of the charges, was 78-96 months, when Clark's ultimate convictions actually amounted to a standard sentencing range of 86-114 months. Clark claims actual prejudice occurred because had he known his correct sentencing range, he would have accepted the plea offer made by the State before trial that had a potential sentencing range of 6-12 months. We disagree.

1.      Legal Principles

Both the U.S. Constitution and the Washington Constitution guarantee the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The right to effective

13

assistance extends to "every critical stage of the criminal proceeding." *In re Pers. Restraint of Garcia-Mendoza*, 196 Wn.2d 836, 840, 479 P.3d 674 (2021). This includes counsel assisting a defendant to make an informed decision as to whether to plead guilty or proceed to trial. *State v. Drath*, 7 Wn. App. 2d 255, 267, 431 P.3d 1098 (2018); *see also In re Pers. Restraint of McCready*, 100 Wn. App. 259, 263, 996 P.2d 658 (2000). We review claims of ineffective assistance de novo. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017).

Courts engage in a two-pronged inquiry to determine whether an individual had effective representation. *Id.* The petitioner must show (1) that counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *Drath*, 7 Wn. App. 2d at 266. In the context of PRPs, a petitioner who demonstrates ineffective assistance of counsel necessarily shows actual and substantial prejudice. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 843, 280 P.3d 1102 (2012); *State v. Buckman*, 190 Wn.2d 51, 60, 409 P.3d 193 (2018). However, "[a]n ineffective assistance claim fails if the defendant fails to satisfy either prong." *Drath*, 7 Wn. App. 2d at 266. Courts need not consider both prongs if a petitioner fails to demonstrate one. *Crace*, 174 Wn.2d at 847.

Here, to satisfy the prejudice prong, Clark must show with reasonable probability that but for the alleged error, he would have taken the State's guilty plea and would not have proceeded to trial. *See Buckman*, 190 Wn.2d at 62. A petitioner's bare allegations that he would have taken the plea offer had he known the consequences is insufficient to establish prejudice. *See id.* When evaluating prejudice, courts engage in "an objective, rational person inquiry, rather than a subjective analysis." *Id.* at 66. "Rationality is an objective inquiry informed by the circumstances of the defendant." *Id.* at 66-67. This means a petitioner must show that "were it not for the

14

constitutional error, a rational person in his situation would more likely than not have" taken the plea offer. *Id.* at 69.

> 2.  Clark Fails to Show Prejudice

Clark argues that he received ineffective assistance because trial counsel was unaware that Clark's conviction for fourth degree assault counted as a repetitive DV offense and, therefore, misadvised him as to his offender score and ultimate sentencing range. Clark asserts that had he realized his standard sentencing range was 86-114 months, "he may not have decided to take the chance on acquittal and instead, accepted the plea bargain of 6 to 12 months." Suppl. Br. of Pet'r at 24-25. We hold that Clark cannot show prejudice, and therefore, we need not address whether trial counsel's performance was deficient. *Crace*, 174 Wn.2d at 847.

Here, the primary inquiry is whether a rational person in Clark's situation would have more likely than not taken the State's plea offer of 6-12 months had that person known his standard sentencing range was 86-114 months instead of 78-96 months. *Buckman*, 190 Wn.2d at 69. Clark needs to show something more than simply the bare allegation that he would have taken the State's offer had he been properly informed. *Id.*

The record shows that trial counsel contacted Clark via telephone to discuss the State's May 10, 2019 plea offer, which comprised of pleading guilty to third degree rape with a potential minimum standard sentencing range of 6-12 months. The record also shows that Clark steadfastly refused to plead guilty to any form of a sex offense, regardless of the potential sentencing ranges. Indeed, in Clark's own words, the most important thing to Clark was to "remov[e] [] any and all sex offense charges" and only then would he be willing to take the State's offer. Suppl. Reply Br.

of Pet'r, Appx. A at 37. The only plea offers the State made required Clark to plead guilty to sex offenses.

In his reply brief, Clark disputes that he told his trial counsel that he would never plead guilty to a sex offense. However, his assertion is belied by his written statement in his bar grievance, which stated that when he was offered the May 10 plea deal, he would only be willing to plead guilty "if the state dropped the third degree rape or any type of sex offense charges." Suppl. Reply Br. of Pet'r, Appx. A at 37.

Clark claims he was prejudiced because he was denied the ability to make an informed decision. However, Clark fails to show anything beyond the bald assertion that he would have taken the State's plea offer. Clark makes much of what trial counsel may or may not have told him. But even accepting Clark's version of the interaction between himself and trial counsel, nothing in the record shows that Clark was willing to accept any plea offer that included a sex offense.

Because Clark fails to show anything more than the bare assertion that he would have taken the State's May 10, 2019 plea offer had he been properly informed of his potential sentencing range and because the record shows that the most important thing to Clark was to not plead guilty to a sex offense, we hold that Clark cannot establish prejudice. Accordingly, Clark's claim of ineffective assistance of counsel fails and we need not address whether trial counsel's performance was deficient. *Drath*, 7 Wn. App. 2d at 266; *Crace*, 174 Wn.2d at 847.

3.      Ineffective Assistance of Appellate Counsel

Clark also asserts that he received ineffective assistance of appellate counsel when appellate counsel failed to raise an ineffective assistance claim relating to his claim that trial

counsel provided incorrect information regarding the applicable standard sentencing range. Because we hold that Clark failed to establish ineffective assistance of trial counsel, Clark's claim of ineffective assistance of appellate counsel necessarily also fails.

C.      PROSECUTORIAL MISCONDUCT

Clark argues that during his trial, the prosecutor engaged in misconduct because they introduced evidence "they knew to be questionable" and then later during closing arguments, made improper statements about that evidence. Initial Pet. at 26. We disagree.

1.      Legal Principles

To prevail on a claim of prosecutorial misconduct, the petitioner must establish both improper conduct and prejudicial effect. *In re Pers. Restraint of Richmond*, 16 Wn. App. 2d 751, 754, 482 P.3d 971 (2021). Courts first determine if the State's conduct was improper. *Id.* If the conduct was improper, courts then assess if the conduct prejudiced the defendant. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

The State is generally allowed wide latitude in closing arguments to argue reasonable inferences from the evidence, "including evidence respecting the credibility of witnesses." *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Furthermore, "[d]eference is . . . owed to the trial court's ability to oversee the administration of justice, defense counsel's judgment about whether an objection was worth raising, and a jury's ability to independently assess the merits of the case." *Richmond*, 16 Wn. App. 2d at 754.

2.      No Improper Conduct

Clark argues the prosecution committed misconduct when it "falsely authenticate[d]" the text messages exchanged between S.V. and Davis that were admitted into evidence.[5]  Initial Pet. at 29.  Clark asserts that the prosecution was aware that the date and timestamps of the messages did not accurately reflect when the messages were sent, yet the prosecutor improperly proceeded with a theory that S.V. and Davis exchanged messages in the middle of the night after the rape occurred.  According to Clark, "[t]here is absolutely no technical or physical evidence that [S.V.] and . . . Davis[] were actually texting in the 'middle of the night'" and Clark was "suspicious of the narrative" and "never believed" that S.V. had done so.  Initial Pet. at 29, 31.

Here, S.V. testified that she waited until Clark fell asleep before she began texting Davis.  S.V.'s testimony was supported by K.V.'s testimony that sometime around 1:00 a.m. the night of the incident, Davis texted K.V. to check on S.V.  Furthermore, one of the text message screenshots actually showed a conversation timestamp of 1:13 a.m.

Also, Clark testified that shortly after the incident, he fell asleep.  Therefore, Clark would have had no way of knowing whether S.V. actually texted Davis in the middle of the night.  Clark's suspicion of S.V.'s narrative becomes a question of credibility, which is not for this court to determine.  *State v. Bell*, 26 Wn. App. 2d 821, 847, 529 P.3d 448, *review denied*, 1 Wn.3d 1035 (2023).  Even so, the record shows that the State did not misconstrue evidence or attempt to mislead the jury about the text messages.

---

[5] We note that Clark does not claim the trial court abused its discretion by admitting evidence of the text messages.

No. 57695-3-II

Courts owe deference to the jury's ability to independently assess the merits of a case. *Richmond*, 16 Wn. App. 2d at 754. Because the prosecution did not mislead the jury about the text message timestamps and because witness testimony supported the theory that S.V. and Davis exchanged texts in the early hours of April 22, there was no improper conduct with regard to the text messages.

Clark also claims that the prosecutor committed misconduct during closing arguments by emphasizing the timing of the text messages. During closing arguments, the State argued:

> But the evidence tells you that [S.V.] reported this rape to [Davis] hours before the towing situation arose.
>
> [K.V.] told you that it was 12:00 or 1:00 in the morning—sometime in the middle of the night [S.V.] says it was more like 2:00—but it was the middle of the night when she texted her friend and told her that she had been raped. Well before the towing issue arose.

5 VRP (May 16, 2019) at 878.

Prosecuting attorneys have wide latitude to argue reasonable inferences from the evidence, "including evidence respecting the credibility of witnesses." *Thorgerson*, 172 Wn.2d at 448. Based on the record and for the reasons discussed above, it is reasonable to infer that S.V. and Davis did indeed exchange texts around 1:00 a.m. on April 22. Because the State argued reasonable inferences from the evidence presented during trial, this court should hold that there was no improper conduct. Because the State did not commit improper conduct either in introducing the text messages or during closing arguments, Clark's claim of prosecutorial misconduct fails. *Richmond*, 16 Wn. App. 2d at 754.

19

D.    COMMUNITY CUSTODY CONDITIONS

Clark argues that the trial court exceeded its authority when it imposed community custody conditions unrelated to his crimes. Specifically, Clark objects to the community custody conditions restricting Clark from possessing or consuming alcohol and marijuana, entering establishments where alcohol is the primary sale item, and submission to urine and breath screenings.

1.    Legal Principles

RCW 9.94A.703 provides conditions that a trial court may impose when a person is sentenced to community custody. *In re Pers. Restraint of Brettell*, 6 Wn. App. 2d 161, 172, 430 P.3d 677 (2018). There are different categories of conditions a court may impose, including mandatory conditions, waivable conditions, and discretionary conditions. *See generally* RCW 9.94A.703(1)-(3). Courts are required to order "waivable" conditions unless they exercise discretion to waive those conditions. RCW 9.94A.703(2); *State v. Houck*, 9 Wn. App. 2d 636, 650, 446 P.3d 646 (2019), *review denied*, 194 Wn.2d 1024 (2020). For instance, a court "shall order an offender to . . . [r]efrain from possessing or consuming controlled substances except pursuant to lawfully issued prescriptions." RCW 9.94A.703(2)(c).

Under RCW 9.94A.703(3), trial courts have the discretion to order offenders to "[r]efrain from possessing or consuming alcohol" and to comply with "any crime-related prohibitions." RCW 9.94A.703(3)(e), (3)(f); *In re Pers. Restraint of Sickels*, 14 Wn. App. 2d 51, 59, 469 P.3d 322 (2020). A crime-related prohibition is an "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). To be directly related means "'reasonably related'" to the crime, and a "causal

20

relationship is not required." *Sickels*, 14 Wn. App. 2d at 59 (quoting *State v. Irwin*, 191 Wn. App. 644, 656, 364 P.3d 830 (2015)). We review crime-related prohibitions for abuse of discretion. *Id.*

Petitioners may challenge the crime-relatedness of their community custody conditions for the first time in a timely PRP. *Id.* Here, because Clark challenges the conditions on nonconstitutional grounds, "he must establish that the claimed error constitutes a fundamental defect that inherently results in a complete miscarriage of justice." *Id.* at 60.

2.      Challenged Community Custody Conditions

Here, the trial court imposed the following challenged community custody conditions:

- No possession or consumption of alcohol
- No possession or consumption of marijuana
- May not enter establishments where alcohol is the primary sale item
- Submit to urine and/or breath screening at the direction of the Community Corrections Officer

CP at 64.

The State concedes that the community custody conditions restricting Clark from entering establishments where alcohol is the primary item for sale and requiring urine and breath screening are not sufficiently crime-related and should be stricken. The parties do not dispute that neither alcohol nor drugs played a role in Clark's crimes. Further, the record demonstrates that no drugs or alcohol were involved. Therefore, the "crime-related" prohibitions on entering an establishment where alcohol is the primary sale item or submitting to a urine and breath screening are not reasonably related to Clark's crimes. RCW 9.94A.030(10); *Sickels*, 14 Wn. App. 2d at 59. We accept the State's concessions.

21

With regard to the restrictions on possession and consumption of alcohol and marijuana, there is no requirement that those conditions be "crime-related" for a trial court to impose as a community custody condition.

RCW 9.94.703(2)(c), a waivable condition, provides that unless specifically waived by the trial court, the trial court *shall order* an offender to "[r]efrain from possessing or consuming controlled substances." Marijuana[6] is a Schedule I controlled substance. RCW 69.50.204(c)(17). Thus, the trial court had the authority to impose the restriction on possession and consumption of marijuana without it being related to Clark's crimes. *Brettell*, 6 Wn. App. 2d at 173.

RCW 9.94A.703(3)(e) authorizes a trial court the discretion to order an offender to "[r]efrain from possessing or consuming alcohol." This condition is separate from the "crime-related prohibitions" under RCW 9.94A.703(3)(f), evincing an intent by the legislature that a restriction on alcohol is *not* a "crime-related prohibition." *See State v. Jones*, 118 Wn. App. 199, 206, 76 P.3d 258 (2003) ("By including the words 'crime-related' in subsections (iii) and (vi) but omitting them from subsection (iv), the . . . legislature manifested its intent that a trial court be permitted to prohibit the consumption of alcohol regardless of whether alcohol had contributed to the offense."). Indeed, in his supplemental briefing, Clark concedes that the trial court has the authority to order him to refrain from possessing or consuming alcohol. Accordingly, the trial court acted within its authority under RCW 9.94A.703(3)(e) when it imposed the restriction on possessing and consuming alcohol.

---

[6] In 2022, the legislature replaced the word "marijuana" with "cannabis" throughout the Revised Code of Washington. SECOND SUBSTITUTE H.B. 1210, 67th Leg., Reg. Sess. (Wash. 2022).

Because, the crime-related community custody conditions—that is, the restriction on entering establishments where alcohol is the primary sale item and urine and breath screening— prohibit conduct that is not directly related to Clark's crimes, we hold the trial court erred in imposing those conditions and those conditions should be stricken from Clark's judgment and sentence. However, because the restrictions on the possession and consumption of alcohol and marijuana are not "crime-related" prohibitions and because the trial court acted within its authority to impose those conditions, the trial court did not err in restricting Clark from consuming and possessing alcohol and marijuana.

E.      OTHER CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

Clark argues that he also received ineffective assistance of counsel because (1) his trial counsel "failed to present evidence that [S.V.] had a memory problem due to a medical condition" and (2) "failed to object to prosecution evidence or subpoena pertinent records and interview relevant witnesses." Initial Pet. at 39. We disagree.

As discussed above, in claims of ineffective assistance, the petitioner must show (1) that counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *Drath*, 7 Wn. App. 2d at 266. Counsel's performance is deficient if it falls "'below an objective standard of reasonableness based on consideration of all the circumstances.'" *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Courts carry a strong presumption that counsel's performance was reasonable and "[w]hen counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." *Id.* at 863.

a.      Evidence of S.V.'s memory problem

Clark argues he received ineffective assistance when his trial counsel failed to present evidence that S.V. had a medical condition that caused her memory issues.  However, Clark raised this same claim in his direct appeal.  *Clark*, No. 53771-1-II, slip op. (unpublished portion) at 30.

Generally, a PRP may not "renew a claim that was raised and rejected on the merits on direct appeal unless the petitioner shows that the interests of justice require reconsideration."  *In re Pers. Restraint of Bell*, 187 Wn.2d 558, 565, 387 P.3d 719 (2017).  Courts may reconsider an issue raised on direct appeal "if there has been an intervening change in the law or some other justification for not raising a crucial point or argument on direct appeal."  *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 750, 101 P.3d 1 (2004).  A PRP should not simply reiterate the same arguments previously resolved and the PRP "must instead raise new points of fact and law."  *Id.*

On direct appeal, Clark argued that "he received ineffective assistance when his trial counsel failed to question and impeach the credibility of SV on her medical condition and related memory problems."  *Clark*, No. 53771-1-II, slip op. (unpublished portion) at 30.  This is the same issue that Clark raises now in his PRP.  Clark does not raise new points of fact or law.  *Davis*, 152 Wn.2d at 750.  In addressing this issue, this court addressed and rejected Clark's arguments.  *Clark*, No. 53771-1-II, slip op. (unpublished portion) at 30.  Therefore, because Clark raised this issue in his direct appeal and this court rejected his arguments on the merits, Clark may not re-raise the issue in his PRP.  *Bell*, 187 Wn.2d at 565.

b.      Failure to object, subpoena, or interview

Clark argues that he received ineffective assistance when his trial counsel failed to object to the admission of the text messages on the grounds that the timestamps were unreliable.  Further,

Clark argues that his trial counsel should have objected to the State's redactions from the admitted text messages and contradicted the prosecution's argued timeline of when the text messages were sent.

During trial, when the parties discussed admission of the text messages, trial counsel stated that there were text messages he would have sought to offer into evidence had the State not planned to introduce the text messages. Thus, the record shows that trial counsel believed at least some of the messages "cast doubt on [S.V.'s] credibility." Br. of Resp't, App. D at 70. This is a legitimate trial strategy. Therefore, because trial counsel's decision to not object to the introduction of the text messages was a legitimate trial strategy, trial counsel's performance cannot be said to be deficient. *Kyllo*, 166 Wn.2d at 863.

The parties and trial court discussed in detail the portion of the text messages that were ultimately redacted—that is, Davis' responses to S.V. Trial counsel argued that portions of the text message chain *should* be redacted. Davis was not a witness during trial, so there was an issue of hearsay. Further, the State even noted that some of Davis' responses were "highly inflammatory" wherein Davis "call[ed] [Clark] names" and that such messages were "too prejudicial" to Clark. 3 VRP (May 15, 2019) at 500. In light of these facts, it was entirely proper for trial counsel to argue for redactions. Trial counsel's conduct can be again characterized as legitimate trial strategy, and therefore, trial counsel's performance was not deficient. *Kyllo*, 166 Wn.2d at 863.

Clark next argues that the "jury was deprived of hearing and seeing evidence which contradicted the prosecution[']s cell phone message timeline." Initial Pet. at 44. Specifically, Clark asserts that the jury never heard evidence that (1) S.V. did not provide her cell phone

messages to law enforcement until days after Clark's arrest; (2) law enforcement did not retrieve the full text message chain from Davis until a year later; (3) Davis contradicted the prosecution timeline; and (4) Clark's proffered timeline was never disproven.

Clark's claims are belied by the record. First, the jury did hear evidence that S.V. did not immediately provide her text messages to law enforcement; Detective Anderson testified to that fact. Second, the jury also heard evidence that law enforcement retrieved the full text message chain from Davis a year later; Detective Anderson testified to that fact as well.

Third, the record shows that Davis *did not* contradict the prosecution's timeline. In Detective Anderson's written report of his interview with Davis, which occurred approximately a year after the actual incident, he noted that Davis recalled "getting a message from [S.V.] *on or around* 4/22/2018" around 10:00 p.m. in the evening. Initial Pet., Ex. H. at 80 (emphasis added). Clark points to Davis' statement that she estimated receiving texts from S.V. around 10:00 p.m. as a smoking gun that S.V. did not text Davis in the early hours of April 22. However, given that Davis was not a witness during trial and that Davis' recollection—supplied a year after the fact— did not definitively state she *only* received texts the night of April 22, it may well have been a strategic choice for trial counsel to not pursue that particular line of inquiry. Indeed, in trial counsel's response to Clark's bar grievance, trial counsel explained: "The evidence at trial showed that these text messages were exchanged between [S.V.] and [Davis] prior to [Clark]'s arrest. This is consistent with the testimony at trial, and the content of the text messages themselves." Br. of Resp't, App. D at 69.

Finally, nothing about Clark's proffered timeline negates the prosecution's timeline—his simple disbelief that S.V. texted Davis *while he was asleep* does not change whether S.V. texted

Davis at all. Moreover, to the extent there are any differences between Clark's timeline and S.V.'s timeline of events, it is a credibility determination and not for this court to determine. *Bell*, 26 Wn. App. 2d at 847. Based on the facts described above, trial counsel cannot be said to have provided deficient performance for failing to "contradict" the prosecution's timeline.

Clark claims trial counsel refused to subpoena S.V.'s phone records and asserts it was "irresponsible" of trial counsel to fail to interview Davis himself. Initial Pet. at 42. The crux of Clark's complaint again appears to be the alleged timeline "contradiction." In trial counsel's response to Clark's bar grievance, trial counsel explained his thinking as it pertained to the timeline:

> The same two sets of text messages were collected by the lead detective in the case from both [S.V.] and [Davis]. The messages collected from [Davis] are time stamped at a later date and time than those collected from [S.V.]. I evaluated and considered this time stamp difference. Part of that evaluation and consideration included my reviewing a report written by the lead detective in the case. According to the detective, the difference in dates was due to [Davis]'s texts being date stamped at the time she downloaded the texts for the detective at the time he went to her house to collect them. I was satisfied with the explanation of the [sic] regarding the time stamp discrepancy. My strategy as discussed with Mr. Clark prior to trial while I was preparing for trial was to try and get the jury to consider that [S.V.'s] credibility is highly questionable due to her conduct and words (including those in the texts) as being inconsistent with what someone would do if they had been raped.

Br. of Resp't, App. D at 70-71. This is a legitimate trial strategy.

Furthermore, Clark speculates that Davis "could have provided crucial testimony at trial" that "may have caused [the] jury to further question [S.V.]'s credibility." Initial Pet. at 42. However, Clark's conjecture *assumes* that Davis had a clear memory of the timing of the text messages and definitively stated she received text messages from S.V. at 10:00 p.m. on April 22. To the contrary, Davis told Detective Anderson—a year after the incident—that she received texts

27

"on *or around*" April 22 and she thought it may have been approximately 10:00 p.m. Initial Pet., Ex. H at 80 (emphasis added).

Trial counsel's decision to not object to the text messages, subpoena S.V.'s phone records, or interview Davis were legitimate trial strategies and not deficient performance. Because defense counsel's performance was not deficient, Clark's claim of ineffective assistance fails.

CONCLUSION

We grant the petition in part regarding the community custody conditions restricting Clark from entering establishments where alcohol is the primary item for sale and requiring urine and breath screening. However, we deny the petition on all other issues. Accordingly, we remand for the trial court to strike the community custody conditions restricting Clark from entering establishments where alcohol is the primary item for sale and requiring urine and breath screening from Clark's judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Che, J.

28